# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| JOSEPH EARNHARDT, *individually and on behalf of all others similarly situated*, )<br><br>Plaintiff, )<br><br>v. )<br><br>TRUSTEES OF ST. JOSEPH'S COLLEGE, d/b/a SAINT JOSEPH'S COLLEGE OF MAINE, )<br><br>Defendant. ) | Case No. |

## CLASS ACTION COMPLAINT; INJUNCTIVE RELIEF SOUGHT; AND DEMAND FOR JURY TRIAL

Plaintiff Joseph Earnhardt brings this Class Action Complaint, individually and on behalf of all others similarly situated (the Class Members), against Defendant Trustees of St. Joseph's College, d/b/a Saint Joseph's College of Maine (SJC or Defendant), alleging as follows:

## NATURE OF THE ACTION

1.      This is a data breach class action against Defendant for its failure to adequately secure and safeguard personally identifiable information (PII).

2.      Mishandling PII can have extremely serious consequences including identity theft and fraud.

3.      Entities that handle personally identifying information have an obligation to employ reasonable and necessary data security practices to protect the sensitive, confidential, and personal information entrusted to them.

4.      This duty exists because it is foreseeable that the exposure of PII—especially to hackers with nefarious intentions—will result in harm to the affected individuals, including

1

identity theft and other long-term financial problems.

5.    The harm resulting from a data and privacy breach manifests in several ways, including identity theft and financial and medical fraud, and the exposure of a person's PII through a data breach ensures that the person will be at a substantially increased and impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives.

6.    Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time, money, and other resources to closely monitor their credit, financial accounts, health records, and email accounts, and to take other prophylactic measures.

7.    In this instance, all of that could have been avoided if Saint Joseph's College had employed reasonable and appropriate data security measures.

8.    SJC is a private college located in Standish, Maine.

9.    SJC knowingly and intentionally obtained PII from students, prospective students, and others who provided their PII to SJC as part of a professional or educational relationship with SJC, and under regulatory, statutory, and common law, SJC has a duty to securely maintain this information in confidence.

10.    This class action seeks to redress SJC's unlawful, willful, and wanton failure to protect the PII of more than 126,000 individuals[1] that was exposed in a major data breach of Defendant's network (the "Data Breach" or "Breach"), in violation of its legal obligations.

11.    According to the Defendant's Data Breach Notice, the Breach occurred more than a year ago.[2]

12.    SJC investigated the attack and confirmed that certain SJC systems containing

---

[1] *See* https://truecountry935.com/major-data-breach-at-st-josephs-college-of-maine/.
[2] *See SJC's Notice of Data Security Incident*, https://www.sjcme.edu/notice-of-data-security-incident/.

confidential and personal information, including Plaintiff's and Class Members' PII, had been accessed without authorization by unknown cybercriminals between December 15, 2023, and January 24, 2024.[3]

13.    By February 20, 2025, SJC determined that the impacted information may include a person's "name, date of birth, Social Security number, driver's license or state identification, passport, financial account information, medical information, and/or health insurance information."[4]

14.    SJC's Notice is deficient for several reasons: (1) while it states that SJC "immediately contained the incident," it fails to provide adequate details about whether the cybersecurity threat has been fully eliminated, leaving victims to fear whether the PII that Defendant continues to maintain is secure; (2) SJC discovered the details of the breach only by February 20, 2025, well after the unauthorized access ended, highlighting inadequate monitoring systems; (3) the Notice fails to state clearly how the Breach itself occurred beyond describing it as "unauthorized access"; and (4) while SJC acknowledges that PII was potentially accessed or acquired, it places the burden on the victims to protect themselves.[5]

15.    It took Defendant *more than a year* to complete its investigation, determine what files that contained PII hackers had accessed or acquired on Defendant's network, and begin notifying the victims.[6]

16.    Despite the cyberattack taking place in December 2023, SJC did not notify affected

---

[3] *Id.*
[4] *Id.*
[5] *See SJC's Sample Notice*, downloadable at https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a5a9e39a-f847-4c4a-b745-a6e841c8f62f.html.
[6] *Id.*

individuals until at least March 21, 2025.[7]

17.     The personal identifiable information exposed in the Breach includes the names, Social Security numbers, addresses, driver's license numbers, financial account information, medical information, and/or health insurance information—the PII of at least 126,580 individuals.[8]

18.     As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII is now in the hands of cybercriminals.

19.     Due to Defendant's negligence, cybercriminals obtained sensitive information that could be used to commit identity theft and wreak havoc on the financial and personal lives of tens of thousands of individuals.

20.     PII has great value to cyber criminals, especially Social Security numbers. As a direct result of Defendant's Data Breach, Plaintiff's and Class's PII is in the hands of cyber-criminals and may be available for sale on the dark web for criminals to access and abuse at Plaintiff's expense.

21.     The modern cyber-criminal can use the information stolen in cyber-attacks to assume a victim's identity when carrying out criminal acts, such as: 1) using their credit history; 2) making financial transactions on their behalf, including opening credit accounts in their name; 3) impersonating them via mail or email; 4) stealing benefits that belong to them; and 5) committing illegal acts which, in turn, incriminate them.

22.     For the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves possessing and misusing their PII. Plaintiff and Class Members will

---

[7] *Id.*
[8] *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ a5a9e39a-f847-4c4a-b745-a6e841c8f62f.html.

have to spend time responding to the Breach and are at an immediate, imminent, and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, deprivation of the value of their PII, loss of privacy, and additional damages as described below.

23.    As a result of Defendant's delayed response, Plaintiff and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant and imminent risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes because of Defendant's negligence.

24.    Consequently, Plaintiff's and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. *See McMorris v. Lopez*, 995 F.3d 295, 301 (2d Cir. 2021) (quoting *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015) ("Why else would hackers break into a store's database and steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities.")).

25.    Because of the Data Breach, Plaintiff and Class Members suffered ascertainable losses and injuries, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains

backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

26.     Plaintiff brings this action individually and on behalf of the Class against SJC for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and declaratory judgment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably necessary and appropriate data security practices to safeguard the PII in Defendant's custody and prevent incidents like the Data Breach from occurring in the future.

## PARTIES

27.     Plaintiff Joseph Earnhardt is an adult who, at all relevant times, was a resident and a citizen of York County in the State of Maine. Plaintiff Earnhardt received a Data Breach notice letter from Defendant in March 2025 informing him that his PII had been compromised in the Data Breach.

28.     Defendant the Trustees of Saint Joseph's College, which does business under the name Saint Joseph's College of Maine, is a nonprofit higher education institution located at 278 Whites Bridge Road, Standish, Maine 04084.

## JURISDICTION & VENUE

29.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

30.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Maine and Defendant conducts substantial business in Maine.

31.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial district, and a substantial portion of the events giving rise to Plaintiff's claims occurred or

emanated from this judicial district.

**JURY TRIAL DEMAND**

32.     Under Federal Rule of Civil Procedure 38(b), Plaintiff demands trial by jury on all issues triable to a jury.

**FACTUAL BACKGROUND**

**A.  The Data Breach**

33.     In the ordinary course of its business practices, Defendant stores, maintains, and uses Plaintiff's and Class Members' PII including their full names, Social Security numbers, and addresses.

34.     Defendant's systems were compromised by cyber criminals between December 15, 2023, and January 24, 2024.

35.     Based on Plaintiff's counsel's investigation, the Data Breach was discovered by SJC at least by January 19, 2024, when SJC became aware of a network incident that impacted its on-campus systems.[9]

36.     It took SJC *over a year* to investigate the attack and confirm that certain SJC systems containing confidential and personal information had been accessed without authorization by unknown cybercriminals.[10] The investigation further confirmed that the Data Breach exposed the personal information of 126,580 individuals, including their names, Social Security numbers, addresses, and driver's license numbers.[11]

37.     Defendant failed to take the necessary precautions required to safeguard and

---

[9] SJC sent an email to students and employees on January 19, 2024, disclosing a cyberattack on its systems.

[10] *See supra*, note 2.

[11] *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a5a9e39a-f847-4c4a-b745-a6e841c8f62f.html.

protect Plaintiff's and other Class Members' PII from unauthorized disclosure.

38.    Defendant also failed to provide timely and specific notice to Plaintiff and Class Members.

39.    Additionally, even though Plaintiff and Class have an interest in ensuring that their information remains protected, Defendant has not shared the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures taken to ensure a breach does not occur again have with regulators or the Class.

40.    Defendant's actions represent a flagrant disregard of the rights of the Class Members, both as to privacy and property.

## B.    Plaintiff's Experience

41.    On about March 25, 2025, Plaintiff received a breach notification letter from SJC informing him that his PII had been exposed to cybercriminals during the Data Breach.

42.    Plaintiff's and Class Members' PII was entrusted to Defendant for educational opportunities with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

43.    To date, Defendant has done next to nothing to adequately protect Plaintiff and Class Members, or to compensate them for their injuries sustained in this Data Breach, particularly given the fact that Plaintiff's PII has already been "impacted" in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

44.    The fraud and identity monitoring services offered by Defendant are only for one year, and SJC places the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for the service.

45. Nor has Defendant compensated Plaintiff and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords, and other actions that Defendant instructs recipients of the Notice to take.

46. Plaintiff and Class Members have been further damaged by the compromise of their PII in the Data Breach which is now in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

47. Plaintiff typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

48. Plaintiff stores any documents containing his PII in a safe and secure location, and he diligently chooses unique usernames and passwords for his online accounts.

49. Because of the Data Breach, Plaintiff's PII is now in the hands of cybercriminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

50. Plaintiff has already spent numerous hours responding to the Data Breach. Among other things, Plaintiff has spent time researching the facts and scope of the Data Breach, monitoring his accounts and personal information, taking steps to research and enroll in identity theft protection services, and taking other actions in an attempt to mitigate the adverse consequences of the Data Breach. This is time that was lost and unproductive and took away from other activities and duties. The letter Plaintiff received from SJC specifically directed him to take these actions.

51. Plaintiff has experienced unrecognized charges on his cards, as well as an increase in spam texts, calls, and emails.

52. Plaintiff also suffered actual injury in the form of damages to and diminution in the

value of his PII—a form of intangible property that he entrusted to Defendant for the purpose of obtaining services from Defendant, which was compromised because of the Data Breach. Defendant acknowledges that Plaintiff and Class Members will need to "remain vigilant in reviewing [their] financial account statements and credit reports for fraudulent or irregular activity on a regular basis."[12]

53.    Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

54.    Plaintiff suffered emotional distress and increased stress and anxiety because of the actions he has been forced to take due to the Data Breach, the loss of control over his most intimate information, and the fact that he must remain vigilant for the remainder of his life.

55.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of criminals.

56.    Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant required the PII from Plaintiff as a condition of sale of educational services by Defendant. Plaintiff, however, would not have entrusted his PII to Defendant had he known that it would fail to maintain adequate data security.

57.    Plaintiff and Class Members presently face substantial risk of out-of-pocket fraud losses such as loans opened in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

58.    Plaintiff and Class Members may also incur out-of-pocket costs for protective

---

[12] *See supra*, note 5.

measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

59.     Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach.

60.     Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

61.     Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

62.     Further, because of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their PII —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

63.     As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

**C. Cyber Criminals Have Used and Will Continue to Use Plaintiff's and Class Members' PII to Defraud Them.**

64.     Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach can and will be used in a variety of sordid ways for criminals to exploit Plaintiff and the Class Members and to profit from their misfortune.

65.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[13] For example, with the PII stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them illegally, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[14] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and the Class Members.

66.    Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal informationin the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services,government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Securitynumber and it's not a good idea because it is connected to your life in so many ways.[15]

67.    PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[16]

68.    This was a financially motivated Breach, as the only reason the cyber criminals go through the trouble of running a targeted cyberattack against entities like SJC is to get information

---

[13] Insurance Information Inst., *Facts + Statistics: Identity Theft and Cybercrime*, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[14] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number* (Nov. 15, 2017), https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/.

[15] Consumer Federation of America, *Dark Web Monitoring: What You Should Know* (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (emphasis added).

[16] GAO, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (July 5, 2007), https://www.gao.gov/products/gao-07-737.

they can monetize by selling on the black market for use in the kinds of criminal activity described in this complaint. Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[17] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[18]

69.    These risks are both certainly impending and substantial. As the Federal Trade Commission (FTC) has reported, if hackers get access to PII, they *will* use it.[19]

70.    Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information ***may continue for years***. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

71.    For instance, with a stolen social security number, which is part of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[21]

72.    The ramifications of Defendant's failure to keep its Class Members' PII secure are long-lasting and severe. Once that information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to twelve

---

[17] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web* (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.
[18] *Dark Web Monitoring: What You Should Know*, *supra*, note 15.
[19] Ari Lazarus, *How fast will identity thieves use stolen info?* (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.
[20] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, *supra* note 13 (emphasis added).
[21] *5 Ways an Identity Thief Can Use Your Social Security Number*, *supra* note 14.

months or even longer.

73.    Further, criminals often trade stolen PII on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PII on the internet, thereby making such information publicly available.

74.    Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[22]

75.    Defendant's offer of limited identity monitoring to Plaintiff and the Class is woefully inadequate and will not fully protect Plaintiff from the damages and harm caused by its failures. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. Once the offered coverage has expired, Plaintiff and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to SJC's gross negligence. Further, identity monitoring only alerts someone to the fact that they have *already been the victim of identity theft* (*i.e.*, fraudulent acquisition and use of a person's PII)—it does not *prevent* identity theft.[23] Nor can an identity monitoring service remove personal information from the dark web.[24] "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[25]

76.    As a direct and proximate result of the Data Breach, Plaintiff and the Class have

---

[22] Federal Trade Commission, *Guide for Assisting Identity Theft Victims*, at 4 (Sept. 2013), https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

[23] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost* (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

[24] *Dark Web Monitoring: What You Should Know*, *supra*, note 15.

[25] *Id.*

had their PII exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of further harm from fraud and identity theft. Plaintiff and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Even more serious is the identity restoration that Plaintiff and other Class Members must go through, which can include spending countless hours filing police reports, following FTC checklists, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps.

77.    Plaintiff and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

a.    Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

b.    Trespass, damage to, and theft of their personal property including PII;

c.    Improper disclosure of their PII;

d.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and having been already misused;

e.    Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their PII and that identity thieves have already used that information to defraud other victims of the Data Breach;

f.    Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

g.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

      h.   Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class members' PII for which there is a well-established and quantifiable national and international market;

      i.   The loss of use of and access to their credit, accounts, and/or funds;

      j.   Damage to their credit due to fraudulent use of their PII; and

      k.   Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

78.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[26] For example, PII can be sold at a price ranging from $40 to $200.[27] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[28]

79.    Moreover, Plaintiff and Class Members have an interest in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting Plaintiff's PII.

80.    Plaintiff and Class Members also have an interest in ensuring that their PII that was provided to SJC is removed from SJC's unencrypted files.

81.    Defendant acknowledged in its letter to Plaintiff and other Class Members that the Data Breach would cause inconvenience to affected individuals by providing numerous steps for

---

[26] *Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends* (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[27] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, (Dec.6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[28] VPN Overview, *In the Dark* (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

Class Members to take to attempt to mitigate the harm caused by the Data Breach.[29]

82.    At SJC's suggestion, Plaintiff is desperately trying to mitigate the damage that SJC has caused him. Given the kind of PII SJC made accessible to hackers, however, Plaintiff is very likely to incur additional damages. This is exacerbated by the fact that cybercriminals have already posted the PII on the dark web.

83.    Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for several years and possibly for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number. [30]

**D.  Defendant Was Aware of the Risk of Cyber Attacks.**

84.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[31] Yahoo,[32] Marriott International,[33] Chipotle,

---

[29] *See supra*, note 5.

[30] *Will a New Social Security Number Affect Your Credit?* (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

[31] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned* (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/ .

[32] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It* (Oct. 4, 2017), https://www.csoonline.com/article/560623/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[33] Patrick Nohe, *The Marriot Data Breach: Full Autopsy* (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

Chili's, Arby's,[34] and others.[35]

85.    SJC should certainly have been aware, and indeed must have been aware, that it was at risk for a data breach that could expose the PII that it collected and maintained.

86.    Educational institutions are frequent targets of cyber hacks and data breaches because they, including SJC, "store so much data, have lots of staff and students with access to their systems, and have increasingly relied on online storage systems to store that data." [36]

**E.  SJC Could Have Prevented the Data Breach.**

87.    Data breaches are preventable.[37] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[38] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised."[39]

88.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and

---

[34] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others* (Aug. 1, 2018), https://www.cnet.com/news/privacy/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/.

[35] *See, e.g.*, *The 18 Biggest Data Breaches of the 21st Century* (Dec. 20, 2018), https://www.csoonline.com/article/534628/the-biggest-data-breaches-of-the-21st-century.html.

[36] Education Week, *What Schools Should Know About the PowerSchool Data Breach* (Jan. 9, 2025), https://www.edweek.org/technology/what-schools-should-know-about-the-powerschool-data-breach/2025/01.

[37] Lucy L. Thomson, "*Despite the Alarming Trends, Data Breaches Are Preventable*," in Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012).

[38] *Id.* at 17.

[39] *Id.* at 28.

disciplined manner so that a data breach never occurs."[40]

89.    In a Data Breach like this, many failures laid the groundwork for the Breach. The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[41]

90.    The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.

91.    The guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

92.    Upon information and belief, SJC failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, SJC also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

93.    As explained by the Federal Bureau of Investigation, "[p]revention is the most

---

[40] *Id.*
[41] FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

effective defense against ransomware and it is critical to take precautions for protection."[42]

94.    To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the FBI, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

---

[42] *See How to Protect Your Networks from RANSOMWARE*, at 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/ decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[43]

95.     Further, to prevent and detect cyberattacks, including the attack that resulted in the

Data Breach, Defendant could and should have implemented, as recommended by the United

States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself.

  Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.

---

[43] *Id.* at 3–4.

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[44]

96.    In addition, to prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

    - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

---

[44] *See Protecting Against Ransomware*, Security Tip (ST19-001) (Apr. 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware.

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events

- **Harden infrastructure**

    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[45]

97.    Given that Defendant was storing the Confidential Information of more than 126,580 individuals, Defendant could and should have implemented all the above measures to prevent and detect malicious cyberattacks.

98.    Specifically, among other failures, SJC had far too much confidential unencrypted information held on its systems. Such PII should have been segregated into an encrypted system.[46] Indeed, the United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information, stating "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[47]

---

[45] *See Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[46] *See, e.g.*, Adnan Raja, *How to Safeguard Your Business Data with Encryption* (Aug. 14, 2018), https://www.digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

[47] *Stolen Laptops Lead to Important HIPAA Settlements* (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

99.    In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all confidential information. Further, the Data Breach could have likely been prevented had Defendant utilized appropriate malware prevention and detection technologies.

**F. Defendant's Response to the Data Breach Is Inadequate to Protect Plaintiff and the Class.**

100.    Defendant failed to inform Plaintiff and Class Members of the Data Breach in time for them to protect themselves from identity theft.

101.    Upon information and good faith belief, Defendant discovered the Data Breach by at least January 19, 2024. Nevertheless, SJC did not notify affected individuals that their PII was compromised until the end of March 2025. Even then, SJC failed to inform Plaintiff and Class Members exactly what information was exposed in the Data Breach, leaving Plaintiff and Class Members unsure as to the scope of information that was compromised.

102.    During these intervals, the cybercriminals were exploiting the information while SJC was secretly still investigating the Data Breach.

103.    If SJC had investigated the Data Breach more diligently and reported it sooner, Plaintiff and the Class could have taken steps to protect themselves sooner and mitigate the damages caused by the Breach.

<u>**CLASS ALLEGATIONS**</u>

104.    Plaintiff brings this class action individually and on behalf of all other individuals who are similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

105.    Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals residing in the United States whose PII was compromised in the SJC Data Breach which occurred between

December 15, 2023, and January 24, 2024, including all who were
sent a notice of the Data Breach (the "Class").

106.    Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and

directors, any entity in which Defendant has a controlling interest, the legal representative, heirs,

successors, or assigns of any such excluded party, the judicial officers to whom this action is

assigned, and the members of their immediate families.

107.    This proposed class definition is based on the information available to Plaintiff at

this time. Plaintiff may modify the class definition in an amended pleading or when they move for

class certification, as necessary to account for any newly learned or changed facts as the situation

develops and discovery gets underway.

108.    **Numerosity:** Based on publicly available information, there are thousands of

members of the Class. The exact size of the Class and the identities of the individual members are

identifiable through Defendant's records, including the files implicated in the Data Breach, but

based on public information, the Class includes about 126,580 individuals.

109.    **Commonality:** This action involves questions of law and fact common to the Class.

Such common questions include:

a.    Whether Defendant failed to timely notify Plaintiff and Class Members of
the Data Breach;

b.    Whether Defendant had a duty to protect the PII of Plaintiff and Class
Members;

c.    Whether Defendant was negligent in collecting and storing Plaintiff's and
Class Members' PII, and thereby breached its duties;

d.    Whether Defendant entered into an implied contract with Plaintiff and Class
Members;

e.    Whether Defendant breached that contract by failing to adequately
safeguard Plaintiff's and Class Members' PII;

     f.   Whether Defendant was unjustly enriched;

     g.   Whether Plaintiff and Class Members are entitled to damages because of Defendant's wrongful conduct; and

     h.   Whether Plaintiff and Class Members are entitled to declaratory judgment due to Defendant's wrongful conduct.

110.   **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class are all individuals who provided their PII to SJC as part of a professional or educational relationship with Defendant and had their PII exposed or accessed by an unauthorized third party.

111.   **Adequacy of Representation:** Plaintiff is adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

112.   **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

113.   **Predominance:** Common questions of law and fact predominate over any

questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

114. **Injunctive Relief:** Defendant has acted and refused to act on grounds that apply generally to the Class, making injunctive and declaratory relief appropriate with respect to the Class under Rule 23(b)(2).

115. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendant's books and records.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (*On Behalf of Plaintiff & the Class*)

116. The above allegations are realleged.

117. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

118. Defendant had a common law duty to prevent foreseeable harm to Plaintiff and Class Members, as they were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing valuable PII that is routinely

targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

119.    Defendant's duty also arose from Defendant's position as an education provider. Defendant holds itself out as a trusted provider of education, and thereby assumes a duty to reasonably protect the PII of students, prospective students, and others who provided their PII to SJC as part of a professional or educational relationship with SJC. Indeed, Defendant was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members because of the Data Breach.

120.    Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. By failing to prevent the successful attack directed towards Defendant that compromised Plaintiff's and Class Members' PII, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of Plaintiff's Class Members' information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program consistent with modern best practices for safeguarding PII; (f) failing to detect the breach at the time it began or within a reasonable time afterwards; and (g) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

121.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff

and Class Members, their PII would not have been compromised.

122.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

a.  Theft of their PII;

b.  Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

c.  Costs associated with purchasing credit monitoring and identity theft protection services;

d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.  Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.  Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j.  The diminished value of the services they paid for and received; and

k.  Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

123.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (*On Behalf of Plaintiff & the Class*)

124.    The above allegations are realleged.

125.    When Plaintiff and Class Members provided their PII to SJC, they entered into implied contracts with Defendant, under which Defendant agree to take reasonable steps to protect Plaintiff's and Class Members' PII, comply with its statutory and common law duties to protect Plaintiff's and Class Members' PII, and to timely notify them in the event of a data breach.

126.    SJC solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's provision of educational services. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

127.    Implicit in the agreement between Plaintiff and Class Members and SJC was SJC's obligation to: (a) use such PII for business purposes only; (b) take reasonable steps to safeguard Plaintiff's and Class Members' PII; (c) prevent unauthorized access or disclosure of Plaintiff's and Class Members' PII; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access or disclosure of their PII; (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized access or disclosure; and (f) retain Plaintiff's and Class Members' PII under conditions that kept such information secure and confidential.

128.    When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with its statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and to timely notify

them in the event of a data breach.

129.     Plaintiff and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their PII from unauthorized access and disclosure. Plaintiff and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. SJC failed to do so.

130.     Plaintiff and Class Members would not have provided their PII to SJC had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of a data breach.

131.     Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

132.     SJC breached its implied contracts with Plaintiff and Class Members by failing to safeguard their PII and by failing to provide them with timely and accurate notice of the Data Breach.

133.     The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

    a.   Theft of their PII;

    b.   Costs associated with purchasing credit monitoring and identity theft protection services;

    c.   Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and their financial accounts;

    d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection

services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g. Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

134. As a direct and proximate result of SJC's breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

135. Plaintiff and Class Members are also entitled to injunctive relief, including requiring Defendant to (1) strengthen its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) immediately provide and continue to provide adequate credit monitoring.

### **COUNT III**
### **UNJUST ENRICHMENT**
### ***(On Behalf of Plaintiff & the Class)***

136. The above allegations are realleged.

32

137.    Plaintiff brings this claim in the alternative to the Second Cause of Action above.

138.    Upon information and belief, Defendant funds its data security measures from its general revenue including payments made by or on behalf of Plaintiff and Class Members.

139.    As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

140.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased educational services from Defendant or its agents and in so doing provided Defendant with their PII.

141.    In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

142.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

143.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures.

144.    Under the principles of equity and good conscience, SJC should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement appropriate data management and security measures that are mandated by its common

law and statutory duties.

145.     Defendant failed to secure Plaintiff and Class Members' PII and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members conferred upon SJC.

146.     Defendant acquired Plaintiff's and Class Members' PII through inequitable means in that it failed to disclose its inadequate security practices.

147.     If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII, they would not have agreed to provide their PII to Defendant.

148.     Plaintiff and Class Members have no adequate remedy at law.

149.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including:

a.   Theft of their PII;

b.   Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

c.   Costs associated with purchasing credit monitoring and identity theft protection services;

d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.   The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.   Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

150. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

151. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

<u>**COUNT IV**</u>
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
***(On Behalf of Plaintiff & the Class)***

152. The above allegations are realleged.

153. Plaintiff and Class Members have a legally protected privacy interest in their PII, which is and was collected, stored, and maintained by Defendant, and they are entitled to the reasonable and adequate protection of their PII against foreseeable unauthorized access, as occurred in the Data Breach.

154. Plaintiff and Class Members reasonably expected that Defendant would protect and

secure their PII from unauthorized parties and that their PII would not be accessed, exfiltrated, and disclosed to any unauthorized parties or for any improper purpose.

155.    Defendant intruded into Plaintiff's and Class Members' seclusion by disclosing without permission their PII to a third party. Defendant's acts and omissions giving rise to the Data Breach were intentional in that the decisions to implement lax security and failure to timely notify Plaintiff and Class Members were undertaken willfully and intentionally.

156.    By failing to keep Plaintiff's and Class Members' PII secure and disclosing PII to unauthorized parties for unauthorized use Defendant unlawfully invaded Plaintiff's and Class Members' privacy right to seclusion by:

    a.  intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

    b.  invading their privacy by improperly using their PII obtained for a specific purpose for another purpose, or disclosing it to unauthorized persons;

    c.  failing to adequately secure their PII from disclosure to unauthorized persons; and

    d.  enabling the disclosure of their PII without consent.

157.    This invasion of privacy resulted from Defendant's intentional failure to properly secure and maintain Plaintiff's and Class Members' PII, leading to the foreseeable unauthorized access, exfiltration, and disclosure of this unguarded and private data.

158.    Plaintiff's and Class Members' PII is the type of sensitive, personal information that one normally expects will be protected from exposure by the very entity charged with safeguarding it. Further, the public has no legitimate concern in Plaintiff's and Class Members' PII, and such information is otherwise protected from exposure to the public by various statutes, regulations, and other laws.

159.    The disclosure of Plaintiff's and Class Members' PII to unauthorized parties is

36

substantial and unreasonable enough to be legally cognizable and is highly offensive to a reasonable person.

160.    Defendant's willful and reckless conduct that permitted unauthorized access, exfiltration and disclosure of Plaintiff's and Class Members' sensitive PII is such that it would cause serious mental injury, shame, or humiliation to people of ordinary sensibilities.

161.    The unauthorized access, exfiltration, and disclosure of Plaintiff's and Class Members' PII was without their consent, and in violation of various statutes, regulations, and other laws.

162.    As a direct and proximate result of Defendant's intrusion upon seclusion, Plaintiff and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiff and Class Members alternatively seek an award of nominal damages.

## COUNT V
## DECLARATORY JUDGMENT
### (*On Behalf of Plaintiff & the Class*)

163.    The above allegations are realleged.

164.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Further, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of federal and state statutes.

165.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Upon information and belief, Defendant's data security measures remain inadequate. Further, Plaintiff will continue to suffer injury because of the compromise of his PII

and remains at imminent risk that further compromises of his PII will occur in the future.

166.    Under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, that:

a.    Defendant owes a legal duty to secure the PII of students, prospective students, and others who provided their PII to SJC as part of a professional or educational relationship with SJC, and to timely notify them of a data breach; and

b.    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' PII.

167.    This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect the PII of students, prospective students, and others who provided their PII to SJC as part of a professional or educational relationship with SJC.

168.    If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another breach of the data held by Defendant.

169.    The risk of another such breach is real, immediate, and substantial.

170.    If another breach at Defendant occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and he will be forced to bring multiple lawsuits to rectify the same conduct.

171.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

172.    Issuance of the requested injunction will not serve the public interest and benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries

that would result to Plaintiff and Class Members whose confidential information would be further compromised in another breach.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Joseph Earnhardt, individually and on behalf of all others similarly situated, prays for judgment in his favor and against SJC and respectfully request that the Court issue an Order:

    a.    Certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

    b.    Finding in favor of Plaintiff and the Class on all counts asserted herein;

    c.    Awarding damages in an amount to be determined by the trier of fact;

    d.    Awarding restitution and all other forms of equitable monetary relief;

    e.    Awarding declaratory and injunctive relief as described herein;

    f.    Awarding Plaintiff reasonable attorney's fees, costs, and expenses;

    g.    Awarding pre- and post-judgment interest on any amounts awarded; and

    h.    Awarding such other and further relief as may be just and proper.

Dated: April 4, 2025               Respectfully submitted,

                          /s/ Braden Beard
                        Braden A. Beard
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Tel: (207) 623-5110
bbeard@work.law

David S. Almeida
*(pro hac vice forthcoming)*
Almeida Law Group LLC
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (312) 576-3024
david@almeidalawgroup.com

*Attorneys for Plaintiff & the Putative Class*